UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MORRIS JOHNSON,

          Petitioner,                             Hon. Robert J. Jonker

v.                                          Case No. 1:10-CV-537

CAROL HOWES,

          Respondent.

_____/

## REPORT AND RECOMMENDATION

        This matter is before the Court on Johnson's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Johnson's petition be **denied**.

## BACKGROUND

        As a result of events which occurred on May 22, 1998, Petitioner was charged with assault with the intent to commit murder. (Trial Transcript, March 2, 1999, 17). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Candace Cline**

Cline and Petitioner began dating in 1994 and as of May 22, 1998, the two resided together at 93 South Union Street, a "large house with two apartments in it." (Trial Transcript, March 2, 1999, 119-20). Cline and Petitioner resided in the downstairs apartment and Maryanne Monteith and Robert Berry resided in the upstairs apartment. (Tr. 120-22).

On May 22, 1998, Cline and Petitioner were involved in "some kind of an argument," during which Petitioner "pushed [Cline] and slammed [her] into the wall." (Tr. 120-25). Following this assault, Cline departed the residence and went to visit her friend, Lottie Deters. (Tr. 125). Cline returned home later that evening at which point she and Petitioner resumed arguing. (Tr. 125-28). Cline immediately decided to again leave the residence, but before she was able to do so she heard a "whoosh" and realized that she "was on fire." (Tr. 128). Petitioner was standing beside Cline when this occurred, but did "nothing" to help her. (Tr. 128-30).

Cline was eventually able to remove her clothing at which point she "fell face first onto the bed to get the rest of the flames out." (Tr. 128-30). Cline asked Petitioner "how could you set me on fire?," but Petitioner offered no response. (Tr. 128-30). Cline then ran outside the residence where she eventually received treatment from emergency medical personnel. (Tr. 128-32). Cline was then transported to the burn unit of a local hospital where she remained for almost three months during which time she underwent multiple surgical procedures. (Tr. 132-33).

**William Howe**

As of June 10, 1998, Howe was employed as the Supervisor of the Battle Creek Police Department Forensics Laboratory. (Trial Transcript, March 2, 1999, 194). On or about this

date, Howe was provided three gas cans that had been recovered during the investigation of the assault of Candace Cline.  (Tr. 194-204).  Howe tested each of these gas cans for latent fingerprints, but was unable to recover any identifiable fingerprints.  (Tr. 204).  According to Howe, it would have been "highly unlikely" to find fingerprints on these gas cans because "they're textured [and] plastic [and] exposed to gasoline which tends to dissolve oils and grease which is a large portion of the percentage of what fingerprints are."  (Tr. 204).

**John Lucey**

Lucey was employed by the Michigan State Police as a forensic scientist.  (Trial Transcript, March 2, 1999, 206-09).  In this capacity, Lucey analyzed materials for the presence of accelerants or ignitible liquids.  (Tr. 206-09).  Lucey analyzed the dress that Candace Cline was wearing on the evening of May 22, 1998, and found that it contained the presence of an accelerant. (Trial Transcript, March 2, 1999, 211-14; Trial Transcript, March 3, 1999, 311, 357-58).  Lucey also examined the three gas cans recovered during the investigation and found that all three contained accelerants.  (Trial Transcript, March 2, 1999, 211-14).

**Robert Huebner**

As of May 22, 1998, Huebner was employed as a paramedic.  (Trial Transcript, March 3, 1999, 244-45).  At approximately 10:00 p.m. that evening, Huebner was dispatched to Candace Cline's residence.  (Tr. 245-46).  When Huebner arrived at the scene, he observed Cline "on the steps. . .with the skin kinda hanging off of her."  (Tr. 246-47).  Huebner observed that Cline was "burned from the waist up, spotty but a lot of involvement with the face."  (Tr. 247-48).  When

3

Huebner asked Cline what happened, she responded, "my boyfriend set me on fire." (Tr. 248).

**Maryanne Monteith**

As of May 22, 1998, Monteith resided in the upstairs apartment at 93 South Union Street. (Trial Transcript, March 3, 1999, 266). That afternoon, Monteith could hear that Petitioner and Candace Cline were having an argument. (Tr. 269-71). Later that evening, Monteith heard Cline "cry out, 'Morris, you set me on fire.'" (Tr. 271). When Monteith went to the stairway she observed that Cline was "on fire" and that her skin "seemed to be falling off." (Tr. 271-72, 276). Monteith then saw Petitioner grab Cline in attempt to prevent her from climbing the stairs toward Monteith's apartment. (Tr. 271-72). Monteith "smelt burnt hair" and heard Cline ask Petitioner, "why'd you set me on fire?" (Tr. 271-72).

**Ruth Deters**

In the early evening of May 22, 1998, Candace Cline went to Deters' residence. (Trial Transcript, March 3, 1999, 307-08). Cline visited with Deters until after dark, at which point she returned home. (Tr. 308-09). Approximately thirty minutes later, Deters heard sirens in the vicinity of Cline's residence. (Tr. 309-10).

**Brian Sparschu**

As of May 22, 1998, Sparschu was employed as a police officer for the City of Battle Creek Police Department. (Trial Transcript, March 3, 1999, 313-14). On this particular evening, Officer Sparschu was dispatched to Candace Cline's residence. (Tr. 314). By the time Officer

Sparschu arrived at the scene, Cline had already been transported away.  (Tr. 314-15).  Officer Sparschu's role in this matter was to simply "secure the scene" while another police officer was obtaining a search warrant.  (Tr. 314-15).

**Kathleen Chrenenko**

As of May 22, 1998, Chrenenko was employed as a police officer for the City of Battle Creek Police Department.  (Trial Transcript, March 3, 1999, 322).  On this particular evening, Chrenenko was dispatched to Candace Cline's residence to investigate a "suspicious" situation.  (Tr. 322-23).  When Chrenenko arrived at the scene, Cline was being treated by paramedics.  (Tr. 323).  After a brief investigation, Officer Chrenenko determined that she needed to obtain a search warrant for Petitioner's apartment.  (Tr. 323-30).

**Martin Brown**

As of May 22, 1998, Brown was employed as a crime scene technician for the City of Battle Creek Police Department.  (Trial Transcript, March 3, 1999, 344).  On this particular evening, Brown was dispatched to Candace Cline's residence "because of a report of an assault taking place."  (Tr. 344).  Brown arrived at the scene shortly after Cline had been transported to a hospital.  (Tr. 345).  After speaking briefly with Officer Chrenenko, Brown traveled to the hospital where Cline was being treated.  (Tr. 345).  Following his arrival at the hospital, Brown heard Cline tell medical personnel that "Morris" had set her on fire.  (Tr. 345-47).

**Michael Bradley**

As of May 22, 1998, Bradley was employed as a police officer for the City of Battle Creek Police Department.  (Trial Transcript, March 3, 1999, 391-92).  On this evening, Officer Bradley was dispatched to Candace Cline's residence.  (Tr. 392).  Upon arriving at the scene, Officer Bradley entered the front hallway of the house so that he could "make contact at the downstairs apartment."  (Tr. 392-93).  Bradley knocked on the door to Cline's apartment, but received no response.  (Tr. 393-94).  Officer Bradley then exited the house to speak with a supervisor.  (Tr. 394).  As soon as he exited the house, Bradley saw somebody close and lock the door into the house.  (Tr. 394).  Shortly thereafter, Officer Bradley discovered Petitioner attempting to flee the vicinity by exiting the house through a rear exit.  (Tr. 395-96).  Petitioner was immediately captured and arrested.  (Tr. 396-97).

**Dr. Alan Messinger**

Dr. Messinger is a plastic surgeon with the Bronson Methodist Hospital burn unit.  (Trial Transcript, March 3, 1999, 401-02).  After receiving brief initial treatment elsewhere, Cline was transferred to the Bronson Methodist Hospital burn unit where she was treated by Dr. Messinger.  (Tr. 406).  The doctor observed that Cline had suffered third degree burns, requiring skin grafts, on her face, chest, and left upper extremity.  (Tr. 406).  Cline also required the assistance of a breathing machine.  (Tr. 406-07).  Cline subsequently experienced "shock lung and pneumonia."  (Tr. 407).

**Dr. Douglas McDonnell**

Dr. McDonnell is an emergency room physician who initially treated Candace Cline

on May 22, 1998.  (Trial Transcript, March 3, 1999, 419).  When Cline arrived at the emergency room, she had "severe burns on her face, her neck, her chest, her arms and her hands."  (Tr. 420).  Cline was "conscious, in agony, and screaming."  (Tr. 421).

**Robert Drewry**

As of May 22, 1998, Drewry was employed as a Detective with the City of Battle Creek Police Department.  (Trial Transcript, March 5, 1999, 429-30).  On this particular date, Drewry executed a search warrant at Candace Cline's residence.  (Tr. 430).  Drewry seized several items, including a burned dress, hair, several gas cans, and lighter fluid.  (Tr. 430-34).

**Morris Johnson**

Petitioner denied setting Candace Cline on fire on May 22, 1998.  (Trial Transcript, March 5, 1999, 447-49).  According to Petitioner, when Cline returned home from Lottie Deters' residence, she expressed a desire to commit suicide.  (Tr. 449-50).  Johnson discounted Cline's comments and attributed such to various difficulties and disappointments that Cline had recently experienced.  (Tr. 450-54).  Johnson then resumed watching television.  (Tr. 454).  A short time later, Johnson discovered that Cline had set herself on fire.  (Tr. 454-55).

Following the presentation of evidence, the jury found Petitioner guilty of the lesser charge of assault with the intent to commit great bodily harm less than murder.  (Trial Transcript, March 8, 1999, 580).  As an habitual felon, Petitioner was sentenced to serve 25-40 years in prison. (Sentence Transcript, April 5, 1999, 26).  Petitioner unsuccessfully appealed his conviction to the Michigan Court of Appeals.  *People v. Johnson*, Case No. 218999, Opinion (Mich. Ct. App., Nov.

6, 2001).  The Michigan Supreme Court declined to review the matter.  *People v. Johnson*, Case No. 120448, Order (Mich., April 29, 2002).

Petitioner later moved again for relief in the Michigan Court of Appeals, asserting several claims one of which was that the trial court erroneously found that he had committed three previous felonies.  Finding that "one of the felony convictions underlying the habitual offender supplement has been reduced to a misdemeanor," the Michigan Court of Appeals remanded the matter to the trial court for re-sentencing.  *People v. Johnson*, Case No. 278485, Order (Mich. Ct. App., Dec. 14, 2007).  At re-sentencing, Petitioner was sentenced to serve 160-240 months in prison.  (Sentencing Transcript, February 25, 2008, 31).  Petitioner subsequently moved in the Michigan Court of Appeals for leave to appeal asserting the following claims:

I.      The trial court erred by imposing 50 points for offense variable 2.

II.     The trial court erred by imposing a sentence that was a two-fold upward departure from the recommended guidelines range.

The court denied Petitioner's application for leave to appeal "for lack of merit in the grounds presented."  *People v. Johnson*, Case No. 287928, Order (Mich. Ct. App., Dec. 2, 2008).  Asserting the same two issues, Petitioner moved in the Michigan Supreme Court for leave to appeal.  Petitioner's request was denied.  *People v. Johnson*, Case No. 138131, Order (Mich., April 28, 2009).  Petitioner initiated the present action on June 4, 2010, in which he asserts the following claims:

I.      The trial court abused its discretion and denied Petitioner his 5th, 6th, 8th, and 14th Amendment rights when it increased Defendant/Petitioner's sentence contrary to the holdings in *Blakely*,

8

*Apprendi*, *Booker*, and *Jones*.

II.    The trial court committed plain error and denied Petitioner his 5th and 14th Amendment rights when it used a presentence report that was incomplete to sentence Petitioner.

III.   Petitioner was denied his 6th Amendment right to effective assistance of counsel and 14th Amendment rights when his trial counsel told Defendant to accept the presentence report "as is" and that he would try to get the sentence reduced.

IV.    Petitioner was denied his 6th and 14th Amendment rights when trial counsel didn't cite any state or federal statutes or constitutional case-law in support of his arguments.

V.     The trial court denied Petitioner his 5th, 6th, and 14th Amendment rights when it found an aggravator that did not exist and used it to increase Petitioner's sentence.

VI.    The trial court abused its discretion and denied Petitioner his 5th, 6th, and 14th Amendment rights when it made an independent finding of guilt of a greater crime and sentenced Petitioner as such.

VII.   Petitioner was denied his 6th and 14th Amendment rights when his appellate counsel didn't contact Petitioner's trial counsel and ask about his lack of strategy at sentencing nor cite trial counsel for being ineffective for not citing Michigan or federal constitutional law in his argument for a reduced sentence.

VIII.  Petitioner was denied his 6th and 14th Amendment rights when his appellate counsel didn't cite any Michigan or federal constitutional violations or case-law in her brief.

IX.    Petitioner was denied his 6th and 14th Amendment rights when his appellate counsel cited the same basic

9

time that the trial court cited in its determination for an increased sentence.

X.    The trial court showed vindictiveness and denied Petitioner his 5th, 8th, and 14th Amendment rights when it sentenced Petitioner to the maximum allowed by law after the trial court was ordered the Court of Appeals to re-sentence Petitioner as a 3rd habitual offender.

## STANDARD OF REVIEW

Johnson's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307.

Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been

12

presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Exhaustion

A petition for writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The petitioner properly exhausts his claims by "fairly presenting his federal claims to the state courts." *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008) (citation omitted). The exhaustion requirement "is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Id.*

While exhaustion requires that the petitioner present his claims to the state's highest court, presenting his claims to *only* the state's highest court may not suffice. The Michigan Supreme

13

Court conducts discretionary review of appeals by application for leave to appeal. In *Castille v. Peoples*, 489 U.S. 346 (1989), the United States Supreme Court held that presentation of an issue for the first time on discretionary review to the state's highest court does not satisfy the "fair presentation" requirement where the court declines to exercise its discretion to review the matter. *Id.* at 351. Applying *Castille*, the Sixth Circuit has likewise determined that the exhaustion requirement is not satisfied where a petitioner first presents a claim on discretionary appeal to the state's highest court, unless that court opts to review the merits of the claim. *See, e.g.*, *Granger v. Hurt*, 215 Fed. Appx. 485, 491 (6th Cir., Feb. 8, 2007); *Hall v. Huffman*, 2000 WL 1562821 at *3 (6th Cir., Oct. 11, 2000).

Petitioner has advanced ten separate claims of relief in this Court, however, none of these claims have been fairly or properly presented to the Michigan Supreme Court. While such is a sufficient basis to dismiss Johnson's petition, the Court nevertheless recommends that Petitioner's claims be denied on the merits for the reasons articulated below. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

## II.        Sentencing Claims  (Habeas Claims I, II, V, VI, and X)

As noted above, while Petitioner's challenges to his conviction were unsuccessful, the Michigan Court of Appeals eventually remanded the matter to the trial court for re-sentencing on the ground that Petitioner had committed only two previous felonies, not three previous felonies as the trial court determined. Petitioner now advances several claims related to the sentence he received on remand.

14

A.      Scoring of the Offense Variables  (Habeas Claims I and V)

Petitioner asserts that the trial judge incorrectly scored several of the relevant offense variables resulting in an inaccurate sentencing guidelines score.  Petitioner also asserts that the trial judge improperly increased his sentence on the basis of factual findings not found by the jury beyond a reasonable doubt in violation of controlling Supreme Court authority.

First, to the extent that Petitioner argues that the scoring of the relevant offense variables is inaccurate in violation of Michigan law, such claim is not cognizable.  *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States"); *Coleman v. Curtin*, 425 Fed. Appx. 483, 484-85 (6th Cir., June 6, 2011) (claims that a state court improperly calculated the relevant offense variables is not cognizable in a federal habeas proceeding).  Petitioner's argument that the trial judge improperly increased his sentence on the basis of facts not found by a jury beyond a reasonable doubt is equally unavailing.

In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id.* at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).  Petitioner asserts that his sentence violates this rule because the trial judge relied upon facts which were neither admitted nor proven beyond a reasonable doubt when scoring several of the offense variables.

In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm.  *Blakely*, 542 U.S. at 298-99.  In so doing, Blakely admitted "the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no

15

other relevant facts." *Id.* at 299.  Washington law provided that the "standard range" to which a

defendant, convicted of this particular offense, could be sentenced was 49-53 months.  However, the

sentencing court was permitted to impose a sentence in excess of the "standard range" if it found

"substantial and compelling reasons justifying an exceptional sentence."  Before imposing an

"exceptional sentence," the sentencing court was required to "set forth findings of fact and

conclusions of law supporting it." *Id.*

       The State recommended that Blakely receive a "standard range" sentence of 49-53

months. *Id.* at 300.  The sentencing court rejected this recommendation, however, and, finding that

Blakely acted with "deliberate cruelty," imposed an "exceptional" sentence of 90 months. *Id.* at 300-

01.  As the *Blakely* Court recognized, under Washington law, the court "could not have imposed the

exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea," but

instead could do so only based on the court's additional determination that Blakely acted with

"deliberate cruelty." *Id.* at 304.  The Court held, therefore, that this sentence violated Blakely's Sixth

Amendment right to trial by jury because it was predicated on facts that were neither admitted by

Blakely nor found by a jury. *Id.* at 301-05.

       The *Blakely* Court, however, made clear that its holding applied only to "determinate-

sentencing schemes" such as that employed by the State of Washington. *Id.* at 308-09.  The Court

recognized that *indeterminate* sentencing schemes do not run afoul of the Constitution because while

such schemes may sanction "judicial discretion" in sentencing, they do not accomplish such "at the

expense of the jury's traditional function of finding the facts essential to lawful imposition of the

penalty." *Id.* at 308-09.  As the Court recognized:

       Of course indeterminate schemes involve judicial factfinding, in that

> a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence - and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence - and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Id.* at 309.

As is well recognized, the State of Michigan employs an indeterminate sentencing scheme. *See, e.g., Montes v. Trombley*, 599 F.3d 490, 497 (6th Cir. 2010); *Porter v. Bauman*, 2011 WL 3501814 at *5 (W.D. Mich., Aug. 10, 2011).

Petitioner was convicted of assault with the intent to commit great bodily harm less than murder. Under Michigan law, conviction for this offense is punishable by "not more than 10 years" in prison. *See* Mich. Comp. Laws § 750.84. However, because Petitioner had also been convicted of two previous felonies, he faced a maximum sentence of "not more than twice the longest term prescribed by law for a first conviction of that offense." *See* Mich. Comp. Laws § 769.11(1)(a). In other words, because of his status as an habitual felon Petitioner faced up to 20 years in prison. On remand, Petitioner was sentenced to serve 160-240 months (i.e., 13 years, 4 months to 20 years) in prison. Thus, when Petitioner committed the crime in question he knew that he could possibly receive a sentence of this magnitude. Because Petitioner received a sentence within the range permitted by Michigan law as a result of his convictions, any additional fact-finding in which the trial court may have engaged did not violate Petitioner's rights under *Blakely* or the

17

Sixth Amendment.  Thus, this claim raises no issue on which habeas relief may be granted.

### B.        Presentence Report  (Habeas Claim II)

Petitioner next argues that he is entitled to relief because the pre-sentence report utilized at his re-sentencing was incomplete.  Specifically, Petitioner asserts that the pre-sentence report "contained no mitigating evidence."  Petitioner's claim fails for two reasons.  First, Petitioner has failed to establish that the pre-sentence report was inaccurate or incomplete.  Specifically, Petitioner has presented no evidence establishing the alleged mitigating factors he faults the trial court for failing to consider.  Furthermore, except in capital cases, the Constitution does not require courts to consider mitigating evidence when calculating a defendant's sentence.  *See, e.g., United States v. Moore*, 643 F.3d 451, 454 (6th Cir. 2011) (citing *Harmelin v. Michigan*, 501 U.S. 957, 996 (6th Cir. 2011).  As this was not a capital case, Petitioner's claim that the pre-sentence report failed to contain any discussion of alleged mitigating factors does not state a claim of constitutional dimension.  Accordingly, this claim raises no issue on which habeas relief may be granted.

### C.        Trial Court Findings  (Habeas Claim VI)

As previously noted, Petitioner was charged with assault with the intent to murder, but convicted of the lesser offense of assault with the intent to commit great bodily harm less than murder. Petitioner asserts that the trial judge improperly "made an independent finding of guilt of a greater crime and sentenced [Petitioner] as such."  Specifically, Petitioner asserts that the trial judge found him guilty of assault with the intent to murder and sentenced him as if he had been convicted of this greater crime.  Petitioner's argument is unpersuasive.

18

While the trial judge questioned how the jury could possibly have found Petitioner guilty of intent to commit great bodily harm less than murder instead of the greater charge of assault with the intent to murder, the trial judge made clear that he respected the jury's determination and would abide by such.  (Sentencing Transcript, February 25, 2008, 27-28).  As the trial judge observed, "[t]hey found the defendant guilty of a lesser offense, assault with intent to do great bodily harm.  How, quite frankly, I don't know, but that was their decision and, as I say, when a jury makes their decision, we all have to live with it."  (Tr. 27-28).  Furthermore, as discussed above, Petitioner's sentence was within the limits established by Michigan law.  This claim, therefore, is without merit.

D.      Trial Court Vindictiveness  (Habeas Claim X)

Petitioner next argues that his constitutional rights were violated where the trial court exhibited "vindictiveness" on re-sentencing.  This claim is likewise without merit.  As Petitioner correctly notes, "the Due Process clause of the Fourteenth Amendment prohibits a court from imposing a harsher sentence on a defendant to punish him for exercising his right to appeal." *Gonzales v. Wolfe*, 290 Fed. Appx. 799, 812-13 (6th Cir., Aug. 20, 2008) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969)).  However, Petitioner did not receive a harsher sentence on remand and there is nothing in the record suggesting that the trial judge acted with vindictiveness when he calculated Petitioner's sentence on remand.  Accordingly, this claim is rejected.

III.        **Ineffective Assistance of Trial Counsel**

Petitioner argues that his constitutional right to the effective assistance of trial counsel

19

was violated where his attorney: (1) failed to present any evidence of mitigating circumstances at sentencing, and (2) "didn't cite any case-law either State or Federal in support of his arguments."

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [she] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

A.      Failure to Present Mitigating Evidence

Petitioner faults his trial counsel for failing to present mitigating evidence at his sentencing.  Specifically, Petitioner asserts that counsel should have made the trial judge aware that he: (1) has a "stable family relationship," (2) is a master auto mechanic, (3) earned numerous credits at college and trade school, (4) receives Social Security disability, and (5) has a good work history. First, as Petitioner has presented no evidence establishing the accuracy of any of these allegations he cannot establish that his attorney rendered deficient performance by failing to present such to the trial court.  Moreover, even if the Court assumes that counsel rendered deficient performance, Petitioner cannot establish that he suffered prejudice therefrom.

To satisfy this prong of the analysis, Petitioner must establish that there exists a reasonable probability that had counsel presented the allegedly mitigating evidence in question he would have received a lesser sentence.  At re-sentencing, the trial judge made clear that the relevant sentencing guidelines failed to sufficiently take into account "defendant's habitual offender status" and "the horrendous circumstances of the crime."  (Sentencing Transcript, February 25, 2008, 22-32).  Accordingly, the trial judge chose to exceed the recommended guidelines range and sentence Petitioner to the maximum penalty allowed under Michigan law.  (Tr. 20-32).  The trial judge also made clear that he would have imposed a much longer sentence if such was possible.  (Tr. 30-31). In light of the trial judge's comments, it is not reasonable to argue that presentation of the allegedly mitigating factors identified above would have resulted in the imposition of a lesser sentence. Accordingly, this claim presents no issue on which habeas relief may be granted.

21

B.      Failure to Cite Legal Authority

Petitioner next faults his counsel for failing to "cite any state or federal statutes or constitutional case-law in support of his arguments" at re-sentencing.  While Petitioner has failed to identify the "arguments" to which he is referring, the Court notes that the only matters which Petitioner's counsel addressed at re-sentencing was the calculation of Petitioner's sentencing guidelines score.  Petitioner has also failed to identify the authority he faults counsel for failing to cite.  Thus, Petitioner has failed to demonstrate that counsel rendered deficient performance.  Furthermore, as discussed in the preceding section, the trial judge disregarded the sentencing guidelines in this matter and instead sentenced Petitioner to the maximum penalty allowed by Michigan law.  It is not reasonable, therefore, to argue that had counsel identified legal authority in support of his arguments concerning the calculation of Petitioner's sentencing guidelines score that such would have resulted in a lesser sentence.  Accordingly, this claim raises no issue on which habeas relief may be granted.

IV.      **Ineffective Assistance of Appellate Counsel**

After he was re-sentenced, Petitioner unsuccessfully moved in the Michigan Court of Appeals for leave to appeal.  Petitioner now asserts three claims of ineffective assistance against the attorney who assisted him on his appeal following his re-sentencing.

A.      Failure to Consult with Trial Counsel

Petitioner first faults his appellate attorney for failing to speak with his trial counsel "to inquire as to why he never raised any state or federal case-law or Michigan or federal statute or

constitutional violation in support of his argument for a reduced sentence."  Considering that Petitioner's appellate counsel did not assert a claim of ineffective assistance of trial counsel, but instead argued that the trial court erred in calculating Petitioner's guidelines score and improperly exceeded the guidelines range when imposing sentence, the Court fails to discern the relevance of questioning trial counsel regarding his perceived shortcomings.  Moreover, even if the Court were to find that counsel rendered deficient performance in this regard, Petitioner cannot establish that he was prejudiced thereby.  Simply put, it is not reasonable to assert that Petitioner's appeal would have been successful had his appellate attorney spoke with Petitioner's trial attorney about matters unrelated to the claims advanced in Petitioner's appeal.  This claim, therefore, is rejected.

B.      Failure to Cite Legal Authority

Petitioner next claims that he is entitled to relief because his appellate counsel failed to cite "any Michigan or federal" authority in her appellate brief.  A review of counsel's brief reveals that she cited to eleven decisions by the Michigan Court of Appeals or Michigan Supreme Court, three separate Michigan statutes, and two Michigan Court Rules.  Petitioner has not argued that the authority cited by counsel was inappropriate or inapposite.  Likewise, Plaintiff has failed to identify any Michigan authority that he believes counsel neglected to cite.  Thus, Petitioner's claim that counsel failed to cite to any Michigan authority is without merit.

As for Petitioner's claim that counsel failed to cite to any federal authority, the Court notes that counsel did not assert claims arising under federal law.  It can hardly constitute deficient performance for an attorney to fail to cite to a body of law under which no claim has been asserted.  Moreover, even if the Court were to find that counsel's failure to cite to federal authority was

23

somehow deficient, Petitioner has failed to identify any federal authority (and the Court is aware of no such authority) that was reasonably likely to have resulted in a different result of his appeal. Accordingly, this claim raises no issue on which habeas relief may be granted.

C.      Failure to Argue for a Lesser Sentence

The sentencing guidelines as calculated pursuant to Petitioner's re-sentencing called for a sentence of 48 to 80 months in prison.  (Sentencing Transcript, February 25, 2008, 20, 30-31). As previously noted, the trial judge imposed on Petitioner a sentence of 160-240 months in prison. On appeal, Petitioner's counsel argued, in part, that the trial judge erred by imposing on Petitioner a sentence which exceeded that recommended by the sentencing guidelines.  Petitioner asserts that he is entitled to habeas relief because his appellate counsel argued, in support of this particular claim, that Petitioner should have instead have been given a sentence consistent with that recommended by the sentencing guidelines.

First, Petitioner's appellate counsel did not argue that Petitioner should have received a sentence consistent with the guidelines recommendation.  Instead, counsel argued that the trial judge's decision to exceed the guidelines was improper and that Petitioner was entitled to yet another re-sentencing.  Counsel did not advocate that Petitioner should have instead received any particular sentence.  Thus, Petitioner's argument is without merit.  Moreover, even had counsel argued that Petitioner should have received a sentence consistent with the sentencing guidelines, the Court fails to comprehend how such an argument could constitute deficient performance.  There is nothing in the record to support the imposition of a sentence shorter than that recommended by the guidelines. It does not constitute deficient performance for counsel to fail to raise frivolous arguments that enjoy

no support in law or in the record.  The Court concludes, therefore, that this claim raises no issue on which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Johnson's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  July 20, 2012                                   /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge